# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs September 25, 2002

## STATE OF TENNESSEE v. ANTHONY PFAHLER

**Appeal from the Circuit Court for Blount County**
**Nos. C-12768 and C-13030     D. Kelly Thomas, Jr., Judge**

**No. E2002-00084-CCA-R3-CD**
**March 31, 2003**

A Blount County Circuit Court jury convicted the defendant, Anthony Pfahler, of especially aggravated robbery, a Class A felony, and aggravated assault, a Class C felony. The trial court sentenced him as a Range II, violent offender to thirty-five years in the Department of Correction (DOC) for the especially aggravated robbery conviction and as a Range II, multiple offender to eight years for the aggravated assault conviction to be served consecutively. In this delayed appeal, the defendant claims (1) that the evidence is insufficient to support his especially aggravated robbery conviction; (2) that the trial court erred by denying his attorney's motion to withdraw; and (3) that his sentences are excessive. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and ALAN E. GLENN, JJ., joined.

Mary L. Ward, Knoxville, Tennessee (on appeal), and R. Mack Garner, District Public Defender (at trial), for the appellant, Anthony Pfahler.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Michael L. Flynn, District Attorney General; and William R. Reed, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the defendant's robbing the E-Z Stop Food Mart on Washington Street. Laura Parton testified that on July 4, 2000, she was working at the store with Ernestine Stevenson and Rosa Darnell. About 11:20 a.m., Ms. Parton and Ms. Stevenson were in the store's office and Ms. Darnell was standing in the doorway that separated the office from the store's deli section. Suddenly, the defendant appeared in the office's back doorway and screamed, "[Give] me the f****** money!" At first, the women thought the defendant was joking. However, the defendant hit Ms. Parton on the back of the head with a cylindrical object, and she fell to the floor. The

defendant hit Ms. Parton again and dragged Ms. Stevenson out of the office and toward the store counter. Ms. Parton testified that she put her hands to her head and felt a cold sensation. She said that she was in constant pain, that the pain felt like someone was sticking straight pins in her head, and that she felt a "splitting sensation." She said that when paramedics arrived, she was drifting in and out of consciousness.

The paramedics took Ms. Parton to Blount Memorial Hospital where doctors used staples to close a wound in the back of her head and sutures to close a wound in the front of her head. After doctors stabilized her, she was transported to Baptist Hospital in Knoxville. In addition to her head wounds, Ms. Parton's left eye filled with blood, and the left side of her face was bruised. She said that she could not work for a couple of weeks after the robbery because she was dizzy and became confused. She said that she also had headaches and took pain medication prescribed by a neurologist for a couple of months after the robbery. She said that at the time of trial, she continued to experience occasional dizziness and pain.

On cross-examination, Ms. Parton testified that after she fell onto the floor, she was conscious and heard the defendant screaming for money. Ms. Parton was released from Baptist Hospital on July 5 and returned to work part-time in the middle of August. She did not resume work full-time until the first of September.

Dr. Allen Romans testified that he was an emergency room physician at Blount Memorial Hospital and treated Ms. Parton on July 4, 2000. He said that when Ms. Parton arrived at the hospital, she lost consciousness temporarily but that she was beginning to become coherent when he examined her. He said that she complained of a headache and asked where she was. Ms. Parton was bleeding heavily from her scalp and had black eyes. She also had a laceration on the left side of her forehead and on the top of her head. The lacerations were caused by a blunt object, and Dr. Romans believed that the defendant had to use a significant amount of force in order to cause them. He said that a CAT scan revealed Ms. Parton's brain had been bruised and that he sent her to Baptist Hospital in case she developed complications and needed a neurosurgeon. He said that a bruised brain could swell and cause a person to have seizures. He said that Ms. Parton suffered a "significant injury," that the amount of force used to cause her lacerations was enough to cause a stroke or death, and that the defendant's attack on Ms. Parton was potentially fatal. He said that Ms. Parton received three types of pain medication, including one to help the pain deep inside her skull. On cross-examination, Dr. Romans testified that Ms. Parton did not have any broken bones. He said that if Ms. Parton was discharged from Baptist Hospital within twenty-four hours, then she did not have any complications that required treatment by a neurosurgeon.

Ernestine Stevenson testified that on July 4, 2000, she and Ms. Parton were in the store office, that she was sitting at a desk, and that Ms. Parton was standing behind her. The defendant came to the office door and told the women that he wanted money. The women laughed because they thought he was joking. However, the defendant said, "[Give] me the f****** money" and hit Ms. Parton with a stick-like object. He then hit Ms. Stevenson three times in the head, and Ms. Stevenson covered her head with her arms. Ms. Stevenson was dazed but could hear the defendant

-2-

screaming. She said that the back of her head was cut once and that the front of her head was cut twice. She said that her arms were bruised and that the little finger on one of her hands was broken.

On cross-examination, Ms. Stevenson testified that after the defendant hit Ms. Parton and Ms. Parton fell to the floor, the defendant hit Ms. Stevenson, pulled her out of the chair, and dragged her toward the cash register. The defendant told Rosa Darnell to open the register, and Ms. Darnell gave the defendant about four or five hundred dollars. The state played the store's surveillance videotape for the jury, and the tape corroborates Ms. Parton's and Ms. Stevenson's accounts of the crimes.

Sergeant Carlos Hess, Jr., of the Maryville Police Department, testified that he investigated the robbery. On July 6, the police developed the defendant as a suspect and arrested him. Sergeant Hess read the defendant his rights, had him sign a waiver of rights form, and interviewed him. The police found a pair of pruning shears in the defendant's back yard, and the defendant told the police that he used the shears during the robbery. After the interview, Sergeant Hess asked the defendant if he wanted to write a letter to the victims. The defendant said yes and wrote a letter in which he apologized to the victims for the crimes. The jury convicted the defendant of especially aggravated robbery against Ms. Parton and aggravated assault against Ms. Stevenson.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant claims that the evidence is insufficient to support his conviction for especially aggravated robbery because the state failed to prove that Laura Parton suffered serious bodily injury, an essential element of the crime. The state contends that Ms. Parton suffered serious bodily injury because the blows to her head involved a substantial risk of death and caused extreme physical pain. We believe the evidence is sufficient.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Especially aggravated robbery is defined as robbery that is "(1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a). A deadly weapon is defined as "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury[.]" Tenn. Code Ann. § 39-11-106(a)(5)(B). "Serious bodily injury" is defined as "bodily injury which involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement;

or (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Tenn. Code Ann. § 39-11-106(a)(34).

The defendant admits that he robbed the E-Z Stop on July 4, 2000. However, he contends that the evidence fails to show that Ms. Parton's injuries involved a substantial risk of death because Dr. Allen Romans acknowledged on cross-examination that the victim suffered no life threatening complications as a result of the attack. He further contends that the evidence is insufficient to prove that the victim experienced "extreme physical pain" from her injuries. The state argues that the proof is sufficient because Dr. Romans testified that the defendant hit the victim's head with enough force to tear her skin and bruise her brain. Moreover, the state points out that Dr. Romans was so concerned about the victim's injuries that he sent her to Baptist Hospital in case she developed complications and needed further treatment from a neurosurgeon. The state also claims that the evidence is sufficient because the victim testified she experienced extreme physical pain.

When the victim arrived at the Blount Memorial Hospital, she was bleeding profusely from her wounds. Dr. Romans used staples to close the wound on the back of the victim's head and sent her to Knoxville in case she needed further treatment. Dr. Romans testified that the victim's brain was bruised and that the blows to her head were potentially fatal. We note that the state introduced photographs of the victim's wounds into evidence, and the photographs show gaping wounds to the back and front of her head. We conclude that the evidence is sufficient to satisfy the element of serious bodily injury.

Moreover, we believe the evidence is sufficient to show that the victim suffered extreme physical pain. As pointed out in the defendant's brief, in State v. Sims, 909 S.W.2d 46, 49 (Tenn. Crim. App. 1995), this court applied the ejusdem generis doctrine of statutory construction to explain that the "extreme physical pain" definition of serious bodily injury must be read as applying to the same class of injury as those causing a substantial risk of death, protracted unconsciousness, protracted or obvious disfigurement, or the protracted loss or substantial impairment of a bodily member, organ, or mental faculty. Id. at 50. The victim in Sims suffered a broken nose and a bruised cheekbone as the result of being hit in the face with a gun by the defendant during a robbery. Id. at 48. After observing that the victim had been given anti-anxiety medication but that no pain medication had been prescribed, this court concluded that the "pain commonly associated with a broken nose" was not "extreme enough to be in the same class as an injury" involving the other elements of the serious bodily injury definition. Id. at 49. Because the proof did not show the type of extreme physical pain required for serious bodily injury, the defendant's conviction was modified from especially aggravated robbery to aggravated robbery. Id. at 50.

Unlike the victim in Sims, the defendant hit Ms. Parton's head with enough force to lacerate her scalp twice and bruise her brain. She described her pain as a "splitting sensation" and feeling like someone was sticking straight pins into her head. In addition, Dr. Romans testified that he gave Ms. Parton three pain medications, and she testified that a neurologist also prescribed pain medicine that she took for a couple of months after the robbery. Taken in the light most favorable to the state, evidence of Ms. Parton's extreme physical pain also is sufficient to establish serious bodily injury.

## II. MOTION TO WITHDRAW

Next, the defendant claims that the trial court abused its discretion by refusing to allow his attorney to withdraw from his case and that he was prejudiced by the trial court's refusal. The state claims that the defendant has not demonstrated prejudice. We conclude that he is not entitled to relief.

The record reflects that after the defendant's trial but before his sentencing hearing, the defendant sent his attorney a letter in which he claimed that his attorney had been "grossly incompetent" for several reasons, including failing to request a change of venue, failing to file a motion to suppress evidence, and his attorney's "preoccupation with other cases and personal on-goings." After receiving the letter, the defendant's attorney filed a motion to withdraw, which the trial court denied. At the beginning of the sentencing hearing, the defendant's attorney stated the following:

> If the Court, please, before the State begins, I'd like to at least for the record, once again, tender our objection to the hearing since Mr. Pfahler has filed his petition to ask me to be removed as counsel. I want to suggest again to the Court that especially in light of whether or not be he may receive a new trial, I don't see how I can counsel him as to whether or not he should testify at this hearing, what evidence he should put on. And since he has, in effect, a post-conviction proceeding pending against me, I've talked to him since then and we've pretty much kind of agreed not to talk to each other. I suggest that it's certainly not going to provide adequate representation and put me in a big ethical quandary if this hearing continues.
>
> So, I understand the Court has already ruled on this, but I want to tender my objection for the record at the hearing.

Three witnesses, including Ms. Parton and Ms. Stevenson, then testified for the state, and the following exchange occurred:

> **THE COURT:** Okay. Proof on behalf of Mr. Pfahler?
>
> [Defendant's attorney]: If the Court please, again, I'm in kind of a difficult position. I understand from Mr. Pfahler he does not intend to offer any proof. He tells me he would like to make a statement. I am sort of along for the ride here and not directing this event, so I - - I don't know exactly what Mr. Pfahler has in mind. I don't know if he would like to make an unsworn statement or - -

**THE COURT:** Well, Mr. Pfahler can testify if he wants to testify. He can take the stand. He doesn't have to. It's his choice.

[Defendant's attorney]: If the Court, please, I've informed him that any - - you know, I believe that any testimony he makes, should he be at some point granted a new trial, may be useable against him. That's about as far as I've gone.
So, Mr. Pfahler, what - -

[State]: If I could interrupt. I don't know if its appropriate as a matter of law, but under the State vs. Momon decision, M-o-m-o-n, which I know Your Honor is familiar with, it seems to me that type of charge by the Court to Mr. Pfahler might be appropriate as to what his specific rights may be as far as electing to testify in this procedure. I know it's not the jury trial, but I just - - that came to mind. I know Your Honor is familiar with that decision, and - -

**THE DEFENDANT:** Your Honor, I don't wish to testify, but I do have a statement.

[State]: Well, I'm going to be asking to cross-examine if he's going to make a statement.

**THE COURT:** Yeah, you - - making a statement and testifying is the same difference. If you want to say something, it has to be under oath, because the State has an opportunity to ask you any questions about the statement that you make. So, do you want to take the stand?

**THE DEFENDANT:** Yes, Your Honor, I will.

The defendant's attorney then questioned the defendant briefly. During his direct testimony, the defendant acknowledged that he had filed a post-conviction petition requesting that his attorney be removed from his case. He also acknowledged that his attorney and the court had advised him that he would be subject to cross-examination by the state if he testified at the hearing. He also acknowledged that he understood his testimony could be used against him "not only today, but in any subsequent trials that would happen." He said that his attorney had refused to request a mistrial during his trial and that he did not want his attorney to represent him at the sentencing hearing. He said that a mistrial had been warranted because (1) a juror knew him; (2) the victims remained in the courtroom during each other's testimony; (3) the jury instructions could have confused the jury as to the crime with which the defendant was charged; (4) the search warrant for his home was illegal; and (5) one of the victims gave false testimony in order to have the defendant indicted for the crimes. He said that although he did not deny his guilt, he believed he was "ill-represented and grossly

overcharged." He asked for a new attorney, and the trial court said it would appoint a new attorney after the sentencing hearing. On cross-examination, the defendant testified extensively about his prior criminal record and prior criminal behavior, including his membership in a street gang and drug abuse.

The defendant claims that the trial court should have allowed his attorney to withdraw because a conflict had developed between them. He also contends that as a result of the trial court's refusal, he had to testify at the sentencing hearing without the "direction and advice" of an attorney and, therefore, was denied his Sixth Amendment right to counsel. Finally, he claims that he was prejudiced by the trial court's ruling because it used the testimony he gave without the benefit of counsel to enhance his sentence and because his attorney failed to present any mitigating evidence. The state concedes that the defendant's attorney renewed the motion to withdraw at the sentencing hearing but argues that the defendant has failed to demonstrate that he was prejudiced by the trial court's ruling.

The Sixth Amendment requires that "'the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense'" in state criminal prosecutions. Gideon v. Wainwright, 372 U.S. 335, 339, 345, 83 S. Ct. 792, 794, 797 (1963) (quoting U.S. Const. amend. VI). However, the Sixth Amendment's protection includes no guarantee of the right to a meaningful relationship between an accused and his counsel, whether counsel be appointed or retained. Morris v. Slappy, 461 U.S. 1, 14, 103 S. Ct. 1610, 1617 (1983); State v. Carruthers, 35 S.W.3d 516, 546 (Tenn. 2000). With respect to motions to withdraw, the trial court may, upon good cause shown, permit the withdrawal of an attorney appointed to represent an indigent defendant. Tenn. Code Ann. § 40-14-205(a). When a defendant seeks to substitute counsel, he or she has the burden of establishing to the trial judge's satisfaction that "(a) the representation being furnished by counsel is ineffective, inadequate, and falls below the range of competency expected of defense counsel in criminal prosecutions, (b) the accused and appointed counsel have become embroiled in an irreconcilable conflict, or (c) there has been a complete breakdown in communications between them." State v. Gilmore, 823 S.W.2d 566, 568-69 (Tenn. Crim. App. 1991). The trial court has wide discretion in matters regarding the appointment and relief of counsel, and its decision will not be set aside on appeal unless the defendant shows an abuse of discretion. State v. Rubio, 746 S.W.2d 732, 737 (Tenn. Crim. App. 1987). Moreover, the defendant must demonstrate that he was prejudiced by the trial court's denying the motion to withdraw. See State v. Branam, 855 S.W.2d 563, 566 (Tenn. 1993).

Initially, we note that in the initial order denying the attorney's request to withdraw, the trial court stated, "After hearing argument from counsel for both parties, the Court is of the opinion that the motion is not well taken and it is overruled." However, no transcript of a hearing on the motion, if there was a hearing, has been included in the record on appeal. Thus, we do not know what the state of the defendant's and the attorney's relationship was before the sentencing hearing and upon what evidence the trial court based its decision to deny the motion. Absent a record, we will presume that the ruling was justified. See State v. Jones, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981). In this respect, we do not have the full context within which to review the withdrawal issue.

The defendant's attorney renewed his motion to withdraw at the sentencing hearing and told the trial court that he and the defendant were no longer speaking to each other. The attorney also stated that he "was along for the ride and not directing this event." Nevertheless, he cross-examined Ms. Parton and Ms. Stevenson, questioned the defendant, and gave a lengthy closing statement in which he argued that the defendant was not a Range II offender, that the defendant should receive a sentence toward the bottom of the range, and that the defendant's sentences should be served concurrently. Moreover, the defendant acknowledged that his attorney told him that the state could cross-examine him if he testified. In light of this, we do not believe the defendant has demonstrated that the trial court abused its discretion in denying the attorney's motion to withdraw. While the record shows that the defendant's relationship with his attorney was greatly strained, the attorney and the defendant were able to communicate enough for the attorney to advise the defendant not to testify and question the defendant during direct-examination. The defendant chose to ignore his attorney's advice.

We must point out, though, that the trial court incorrectly required the defendant to testify if he wanted to address the court. Pursuant to Tenn. Code Ann. § 40-35-210(b)(6), the trial court must consider "[a]ny statement the defendant wishes to make in the defendant's own behalf about sentencing." We believe this allows the defendant the choice of addressing the trial court directly, as opposed to testifying under oath.

In any event, we do not believe the defendant has demonstrated that he was prejudiced by the trial court's rulings. The attorney cross-examined witnesses and argued several sentencing issues. Moreover, although the defendant took the stand and testified about his prior convictions and prior criminal behavior "without the benefit of counsel giving him direction and advice," most of that information was included in the defendant's presentence report. Regarding the defendant's claim that he also was prejudiced by the fact that his attorney presented no mitigating evidence, the defendant has failed to explain what evidence, if any, his attorney should have presented on his behalf. The defendant is not entitled to relief.

### III. EXCESSIVE SENTENCES

Next, the defendant contends that the trial court committed various sentencing errors. Specifically, he contends that the trial court improperly classified him as a Range II offender, improperly enhanced his sentences, failed to consider his remorse as a mitigating factor, and improperly ordered consecutive sentencing. The state contends that the trial court properly sentenced the defendant. We agree with the state.

At the sentencing hearing, Laura Parton testified that she felt the scars from the defendant's attack every time she washed her hair. She said that she thought about the defendant daily and that the robbery had affected her emotionally. After the robbery, her fourteen-year-old son had to leave home because he could not stand to look at her face. She said that she did not understand why the defendant had to hit her and Ms. Stevenson. She said that the defendant did not care about what he had done and should receive the maximum sentence. On cross-examination, she acknowledged that

when the defendant first asked for the money, she laughed at him. She said, though, that the defendant never gave her and Ms. Stevenson a chance to give him the money.

Ernestine Stevenson testified that the robbery had affected her and Ms. Parton greatly. She said that her family worried about her constantly and that her son would not let her work at the store at night by herself. She said that she could not stand for anyone to be behind her, that her hand would never be the same, and that she still suffered from headaches and dizzy spells. She said that the robbery had made her a stronger person but that she could never forgive the defendant and that he should receive the maximum sentence. On cross-examination, she testified that the store's policy was to give a robber the money. She said that she and Ms. Parton laughed when the defendant first asked for the money but that he did not give them time to give him the money before he started hitting them.

Tommy Hunt, one of the owners of the E-Z Stop Food Mart, testified that at the time of the robbery, Ms. Stevenson was training Ms. Parton to be the manager of the store, and Ms. Stevenson was going to be the manager of a larger store. He said that he arrived at the E-Z Stop soon after the robbery and that he had to use two mop buckets to clean up the blood that was on the office floor. He said that the defendant came into the store, asked the women a question, and "started whaling away." He said that the defendant stepped over Ms. Parton and Ms. Stevenson to get to the cash register and that the defendant showed no emotion or sympathy for them. He said that his company employed about one hundred fifty people and that the robbery had caused his employees to worry about someone hitting them from behind. He said that the community needed to send a message to other people thinking about committing this type of crime, that the defendant should not be on the street, and that the defendant deserved the maximum sentence. He said that the amount of money his store lost was small compared to the amount of money the victims lost for medical expenses and time missed from work.

The defendant testified that at the time of the hearing, he was twenty-four years old and had a GED. He said that he was sorry for what he had done and for the pain and suffering he had caused the victims and their families. He said that he hoped their health and lives would be restored to normal. On cross-examination, he testified that when he was seventeen years old and living in Arizona, he took a handgun from his mother's bedroom and fired it into a busy shopping mall parking lot. He acknowledged that he shot three or four times at a truck and that a bullet struck the truck. He said that the truck's driver and passengers were not injured but that it was very lucky no one had been killed. He said that he pled guilty to two counts of aggravated assault and that he was sentenced as an adult. He said that he did not pay all of the restitution that the trial court ordered but that he spent two and one-half years in prison. He said that he also spent time as a juvenile in rehabilitation for his problems with anger, gangs, and drugs. He said that he started using drugs when he was about twelve years old; that he had used methamphetamine, LSD, marijuana, and steroids; and that he used crack cocaine the day before he robbed the E-Z Stop. He said that he had been a member of the Crips gang in Arizona and that he came to Tennessee in order to get away from it.

According to the defendant's presentence report, the defendant spent fourteen months in Westbridge Residential Program when he was about thirteen years old for his problems with suicide, anger, and drugs. In the report, the defendant denied abusing alcohol but said he started using marijuana when he was about thirteen years old and began using cocaine when he was fifteen years old. In the report, he also said that he used crack cocaine and that he began using heroine when he served time in an Arizona prison. The report reflects that the defendant also used "speed," LSD, and steroids and that he lived in Arizona from age two until February 1999, when he moved to Tennessee in order "to get away from bad influences." The defendant reported that he became involved in a gang when he was thirteen and did not have a good childhood. He described his physical health as good and his mental health as fair and said he took medication for depression. The report shows that the defendant worked at Motor Mile Detail Shop from February 1999 to May 2000.

The state also introduced into evidence certified copies of the defendant's Arizona convictions. According to the records, the defendant pled guilty on June 27, 1995, to two counts of aggravated assault and received concurrent sentences of 3.75 years for each conviction. Both of the convictions resulted from the defendant's shooting at a truck occupied by the truck's driver and at least one passenger on August 28, 1993, when he was seventeen years old.

The trial court classified the defendant as a Range II offender based upon his prior aggravated assault convictions. The trial court noted that the defendant's presumptive sentence for the especially aggravated robbery conviction was thirty-two and one-half years, the midpoint in the range for a Class A felony, and six years for the aggravated assault conviction, the minimum in the range for a Class C felony. See Tenn. Code Ann. §§ 40-35-112(b)(1), (3), -210(c). The trial court determined that enhancement factors (1), that the defendant has a previous history of criminal behavior, and (3), that the crime involved more than one victim, applied in this case. See Tenn. Code Ann. § 40-35-114(1), (3) (Supp. 2001) (amended 2002).[1] It also determined that although the defense had not argued any mitigating factors, factor (13) applied because the defendant successfully completed a period of parole for his Arizona convictions. See Tenn. Code Ann. § 40-35-113(13). The trial court stated, though, that any mitigation for that factor should be weighed against the fact that the defendant did not pay all of the restitution that had been ordered for the convictions. The trial court sentenced the defendant to thirty-five years for the especially aggravated robbery conviction and eight years for the aggravated assault conviction. It also determined that the defendant was a dangerous offender and ordered that the sentences be served consecutively. See Tenn. Code Ann. § 40-35-115(b)(4). The defendant claims that the trial court made several sentencing errors that resulted in his receiving an excessive sentence.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing

---

[1] The legislature's 2002 amendment to Tenn. Code Ann. § 40-35-114 added as the new enhancement factor (1) that the "offense was an act of terrorism" but changed the existing enhancement factors only in increasing their designating number by one. Thus, former enhancement factor (1) is now enhancement factor (2) and factor (3) is now factor (4).

Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

The sentence to be imposed by the trial court is presumptively the midpoint in the range for a Class A felony and the minimum in the range for a Class C felony unless there are enhancement factors present. Tenn. Code Ann. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. Tenn. Code Ann. § 40-35-210(d)-(e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments; State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986); see Ashby, 823 S.W.2d at 169.

In conducting our de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; Moss, 727 S.W.2d at 236-37.

## A. Range II Offender

The defendant claims that the trial court erred by classifying him as a Range II offender based upon his two aggravated assault convictions in Arizona. Specifically, he contends that the state failed to prove that he would have been tried as an adult in Tennessee for the crimes. In addition,

he claims that he was not advised when he pled guilty that the convictions could be used against him in future convictions. Finally, he argues that the trial court should not have used his two convictions to classify him as a Range II offender because they were committed as part of a single course of conduct. See Tenn. Code Ann. § 40-35-106(b)(4). The state contends that the trial court properly classified the defendant as a Range II offender. We agree with the state.

In order to be classified as a Range II offender, a defendant must have a "minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes." Tenn. Code Ann. § 40-35-106(a)(1). In addition, a

> finding or adjudication that a defendant committed an act as a juvenile that would constitute a felony if committed by an adult, and which resulted in a transfer of such juvenile to criminal court pursuant to § 37-1-134, or similar statutes of other states or jurisdictions, shall not be considered as a prior conviction for the purposes of this section unless such juvenile was convicted of a felony in criminal court . . . .

Tenn. Code Ann. § 40-35-106(b)(3). Convictions for multiple felonies committed within twenty-four hours of each other and as part of a single course of conduct constitute one conviction for the purpose of determining prior convictions. Tenn. Code Ann. § 40-35-106(b)(4). However, convictions involving acts that result in bodily injury or threatened bodily injury to the victim are excluded from this rule. Tenn. Code Ann. § 40-35-106(b)(4). Furthermore, prior convictions

> include convictions under the laws of any other state, government, or country which, if committed in this state, would have constituted an offense cognizable by the laws of this state. In the event that a felony from a jurisdiction other than Tennessee is not a named felony in this state, the elements of the offense shall be used by the Tennessee court to determine what classification the offense is given.

Tenn. Code Ann. § 40-35-106(b)(5). Submission of certified copies of the defendant's prior convictions is prima facie evidence of the defendant's prior felony record. See Tenn. Code Ann. § 40-35-202(a).

We conclude that there is no merit to the defendant's contentions that the state failed to prove that he would have been convicted as an adult in Tennessee and that the Arizona Superior Court failed to warn him that his convictions could be used to enhance any future convictions. Tennessee does not require an assessment of whether the defendant would lose his juvenile status in Tennessee; the emphasis is on the elements of the crime. Obviously, his shooting at an occupied truck constitutes aggravated assault in Tennessee. See Tenn. Code Ann. § 39-13-102(a)(1)(B). The mere failure to advise the defendant about the enhancement potential of the convictions upon future sentences does not void the convictions for their enhancement value. Regarding the defendant's

-12-

single course of conduct issue, the defendant's firing a weapon at an occupied truck threatened bodily injury to the victims and, therefore, could not be treated as only one conviction. We conclude that the trial court properly classified the defendant as a Range II offender.

## B. Enhancement Factors

Next, the defendant contends that the trial court improperly enhanced his sentences. Specifically, he contends that the trial court should not have used enhancement factor (1), that he has a prior history of criminal behavior, to enhance his sentences because he testified about his prior criminal behavior without the benefit of counsel. In addition, he claims that the trial court improperly applied enhancement factor (3), that the crimes involved more than one victim, to his sentences because the third employee present during the robbery was merely a witness, not a victim. The state claims that the trial court properly applied the enhancement factors. We agree with the state.

As previously stated, the defendant was not denied his Sixth Amendment right to counsel at his sentencing hearing. To the contrary, the defendant's attorney advised him not to testify, and the defendant chose to ignore that advice. Moreover, the defendant's presentence report details his gang involvement and extensive drug use. Therefore, even if the defendant had not testified at the sentencing hearing, the trial court could have properly used the prior criminal behavior detailed in his presentence report to enhance his sentences.

As to the defendant's claim that the trial court improperly applied factor (3) relating to the crime involving more than one victim, we note this court has held previously that enhancement factor (3) may not be applied when the defendant is separately convicted of offenses against each victim. State v. Williamson, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995). The term victim is limited to a "person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime." State v. Raines, 882 S.W.2d 376, 384 (Tenn. Crim. App. 1994). In this case, the defendant was charged and convicted of especially aggravated robbery against Ms. Parton and aggravated assault against Ms. Stevenson. However, he was not charged with any crime against Ms. Darnell. The evidence reveals that after the defendant came into the office and hit Ms. Parton and Ms. Stevenson, he approached Ms. Darnell and forced her to give him the money from the cash register. Obviously, Ms. Darnell was a victim of the robbery, and the trial court properly applied enhancement factor (3).

## C. Mitigating Factor

The defendant contends that the trial court erred by failing to consider his remorse as a mitigating factor. See Tenn. Code Ann. § 40-35-113(13). The state contends that the trial court's silence regarding the defendant's remorse suggests that the trial court did not believe the defendant's remorse was genuine. We believe the trial court should have considered the defendant's remorse as a mitigating factor.

At trial, Sergeant Carlos Hess, Jr. testified that after he arrested and interviewed the defendant, he asked the defendant if the defendant wanted to write a letter to the victims and that the defendant said yes. In the letter, the defendant stated the following:

> I'm sure this is no [consolation] to you, I am deeply sorry for what I have done. If I could change the events that happened I would, not because I was caught, because I am sorry. I'm willing to take what ever I have coming to me because I deserve what I have coming. What I did was wrong. No matter what I write or say could never undo what I have done. As pathetic as it sounds I'm sorry.

At the sentencing hearing, the defendant again expressed remorse for the crimes and apologized to the victims. The trial court stated that although the defense had not filed a list of mitigating factors for it to consider, it had considered the statutory mitigating factors in Tenn. Code Ann. § 40-35-113 and determined that none of them applied. The trial court also stated that it had considered factor (13), any other factor consistent with the purposes of this chapter, and determined that the defendant's having completed probation successfully for his Arizona convictions deserved some weight. The trial court did not address the fact that the defendant had expressed remorse.

This court has held that remorse can be considered under the catchall mitigating provision. State v. Butler, 900 S.W.2d 305, 314 (Tenn. Crim. App. 1994); see Tenn. Code Ann. § 40-35-113(13). In light of the letter that the defendant wrote soon after the crimes and his testimony at the sentencing hearing, we agree with the defendant that the trial court should have applied this mitigating factor to his sentence. However, given the defendant's extensive drug abuse and low potential for rehabilitation, we believe the trial court's enhancing his sentence from thirty-two and one-half years to thirty-five years for especially aggravated robbery and from six to eight years for aggravated assault was justified.

## D. Consecutive Sentences

Finally, the defendant claims that the trial court erred by ordering that he serve his thirty-five- and eight-year sentences consecutively. Specifically, he contends that the trial court erred by determining that he is a dangerous offender pursuant to Tenn. Code Ann. § 40-35-115(b)(4) because he does not have an extensive history of violent behavior, was convicted of no other crimes between the time of his Arizona convictions and his convictions for the offenses in question, successfully completed a period of probation for his Arizona convictions, and has a potential for rehabilitation. The state contends that the trial court properly classified the defendant as a dangerous offender because he viciously attacked two women who were unarmed and did not resist him. We conclude that the trial court did not err in ordering consecutive sentencing.

Consecutive sentencing is guided by Tenn. Code Ann. § 40-35-115(b), which states in pertinent part that the court may order sentences to run consecutively if it finds by a preponderance of the evidence that the defendant is a "dangerous offender whose behavior indicates little or no

regard for human life, and no hesitation about committing a crime in which the risk to human life is high." For dangerous offenders, though, "consecutive sentences cannot be imposed unless the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995); see State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). Rule 32(c)(1), Tenn. R. Crim. P., requires that the trial court "specifically recite the reasons" behind its imposition of a consecutive sentence.

The trial court held that consecutive sentencing was justified because of the head injuries received by one of the victims and the medical evidence presented at trial. Our review of the E-Z Stop's surveillance videotape shows that just before the crimes, Ms. Stevenson was sitting at a desk in the office, Ms. Parton was standing behind her, and Ms. Darnell was standing in the office doorway. The defendant appeared in a second doorway, and the women looked at him and smiled. The defendant then hit Ms. Parton and Ms. Stevenson. The defendant stepped over Ms. Parton, who had fallen to the floor, and pulled Ms. Stevenson out of her chair. When Ms. Stevenson fell onto the floor, the defendant stepped over her and approached Ms. Darnell. Ms Darnell gave the defendant money from the cash register, and the defendant left the E-Z Stop. Ample evidence supports the trial court's finding that the defendant's behavior indicated little or no regard for human life and that the defendant had no hesitation about committing a crime in which the risk to human life is high.

However, the trial court failed to address the Wilkerson factors, which removes the presumption of correctness for the consecutive sentencing determination. First, the effective sentence of forty-three years does reasonably relate to the severity of the defendant's offenses. The defendant suddenly attacked the unarmed victims by hitting them repeatedly and without giving them an opportunity to comply with his demands for money. As a result, both of the victims suffered serious injuries. Furthermore, the defendant's behavior from his prior aggravated assaults to the present offenses reflects continued violence, and consecutive sentences are necessary to protect society from him. Thus, the trial court properly ordered consecutive sentencing.

Based upon the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, JUDGE

-15-